"As already stated, the action in justice's court was for conversion, and within: the second subdivision of section 2895 of the Code of Civil Procedure, if the act of the plaintiff in this action in failing to pay over the money collected by him was, as matter of law, conversion."

In the case in hand it was the duty of the defendant, upon receiv- ing the money mentioned in the complaint, "to have immediately car- ried the money or check to his assignee, and, not doing so, he be- came liable for conversion upon failure to pay over on demand." The case from which the quotation has just been made is authority for issuing a body execution in the case in hand. Carrigan v. Wash- burn (City Ct. N. Y.) 2 N. Y. Supp. 616, cited by the respondent, is, not applicable to the case in hand. That was a case where the plain- tiff's right to arrest the defendant did not depend upon the nature of the action, but upon extraneous grounds. Nor does Roeber v. Dawson (City Ct. N. Y.) 3 N. Y. Supp. 122, aid the contention of the respondent. In that case it is said, "The plaintiff in this case could not recover without proof beyond the complaint allegations." In Longuemare v. Nichols (City Ct. N. Y.) 7 N. Y. Supp. 672, it was held that "where a plaintiff is defeated, and defendant seeks to pur- sue him on a judgment for costs, plaintiff becomes a defendant, with- in Code Civ. Proc. § 572." Whenever a plaintiff brings an action in tort, and seeks to recover in tort, if he is defeated and the de- fendant recovers costs he is entitled to have a body execution. Phil- brook v. Kellogg, 21 Hun, 238. The doctrine which we have already adverted to was approved in Parker v. Spear, 62 How. Prac. 394, and it was said that the principle aptly illustrates the truth of the old proverb, that "those who take the sword should perish by the sword." It seems from the affidavit that the plaintiff was willing to obtain a body execution after he had obtained judgment against the defendant, while it remained unreversed. The foregoing views lead to the conclusion that the special term fell into an error when it set aside the body execution issued against the plaintiff. We think the order should be reversed, and the defendant should be al- lowed to pursue his remedy against the plaintiff, to recover the costs of the action.

Order reversed, with $10 costs and disbursements, and motion de- nied, with $10 costs. All concur.

---

(19 App. Div. 29.)

### DODGE v. ACKER et al.

(Supreme Court, Appellate Division, Fourth Department. June 12, 1897.)

1. AGENCY—WEIGHT OF EVIDENCE.

A purchaser offered $6,000 for property, $4,000 to be cash obtained from a third person, secured by first mortgage on premises, the remaining $2,000 to be a deferred payment secured by a second mortgage to vendor. The propo- sition being refused, the matter rested. Subsequently, the vendor's attorney informed the purchaser that the old proposition would be accepted, upon which the transfer was made, and the two mortgages executed on same day, nothing being said by either party at the time as to the precedence of the $4,000 mortgage. The third person loaned the money upon the express representation.

of a disinterested person that the vendor had agreed that the mortgage to secure the loan should take precedence. The vendor denied that the attorney was his agent in the matter, but the testimony showed that he had told the latter that he would sell to the purchaser for $6,000, and the attorney, although in court, was not placed on stand to deny agency. *Held*, that the attorney acted as the vendor's agent in giving information of the terms of the sale.

**2. MORTGAGES—ASSIGNMENT—EQUITIES.**

Regardless of the question of consideration, the assignee of a mortgage takes subject to all the equities existing between the parties thereto, and also to equities that third persons have against the mortgagee.

Appeal from special term, Seneca county.

Action by Masourie Dodge against Frederick L. Manning and others. From judgment for defendants, plaintiff appeals. Affirmed.

The following is the opinion of Mr. Justice RUMSEY, at special term.

This is an action to foreclose a mortgage. The defendants, Manning and Acker, as executors of one Sophia Kennard, have a mortgage upon the same premises, dated at the same time, and the only question presented here is one of fact, and that is whether, at the time the mortgage to Kennard was given, it was agreed by the holder of the plaintiff's mortgage that the Kennard mortgage should be a first lien upon said premises. It appears that in March, 1888, one Harvey Dodge was the owner of a farm of land situate in the town of Varick, which the defendant Day wanted to buy. After considerable negotiation, the price to be paid for the farm was agreed at $6,000, and it was further agreed that Day should pay $4,000 in money and should secure the remaining $2,000 by his mortgage upon the premises. It is the $2,000 mortgage, given in pursuance of that agreement, which this action is brought to foreclose. Day applied to the agent of Sophia Kennard to borrow the $4,000 to be paid to Dodge, offering to secure the money by a mortgage on these premises, and represented to the agent that it had been agreed between himself and Dodge that this mortgage to be given to Mrs. Kennard should be a first mortgage upon the premises which Dodge was to convey to him. Relying upon that representation, Mrs. Kennard's agent advanced the sum of $4,000, and took as security Day's bond, secured by a mortgage on these premises. All these facts are substantially undisputed, and the only disputed question of fact is whether Dodge did make the agreement that the $4,000 mortgage should be a first lien upon the premises which he was to convey to Day. All the evidence given upon the trial was addressed to that question, and that is the only question which there is to decide in this case.

It was testified by Day and one Blake, who assisted in the negotiation, that, after the price of the land had been fixed at $6,000, Dodge was told that Day could raise $4,000 to pay down only by giving a first mortgage upon these premises, and that the mortgage to secure Dodge for his $2,000 of deferred payment must be a second mortgage. Blake says that Dodge demurred to allowing this, as it was very natural he should do, but finally agreed that he would consent to permit the $4,000 mortgage to be the prior lien, upon condition that the bond for $2,000 should be signed by Day's father, who seems to have been a man of responsibility. Day's father, however, refused to execute this bond, and thereupon the deal fell through. Such is the story of Blake and Day, as to the first part of the negotiation which was had with Dodge respecting the sale of this property. Mr. Dodge, who was examined as a witness in behalf of the plaintiff, tells a somewhat different story, but unfortunately his memory was evidently poor, and he contradicted himself so many times with regard to material as well as immaterial matters that little credit can be given to what he said, however much he may have desired to tell what he believed to be the truth. The story of Blake and Day, who were entirely disinterested in the matter, must be accepted as the truth of the case, so far as the preliminary negotiations were concerned. After these negotiations had fallen through, Day went to another county, and there remained until Blake sent for

him, saying to him substantially that the farm could be bought. He came home, and the sale of the farm was finally completed. There is some dispute between the parties as to just what took place at the time the deed was given. It is conceded on all hands that it was given in the office of one Opdyke, who was then a practicing lawyer in the village of Waterloo. Blake and Day say that before the giving of the deed they went to the office of Mr. Manning, the attorney and agent of Mrs. Kennard, and there Day executed the bond and mortgage for $4,000, and received a certificate of deposit to Mrs. Kennard, indorsed by her. It appears from the testimony of Mr. Manning that he did deliver to them, in return for the bond and mortgage, such a certificate of deposit, and that he did that upon the faith of a statement made to him by Blake in Day's presence, that Dodge had agreed that the $4,000 mortgage should be the prior lien upon the property, ahead of the $2,000 mortgage, which was to be given to Dodge. Dodge was not present at the time the $4,000 mortgage was given. Blake and Day testified that after the $4,000 mortgage had been given they went with the certificate of deposit, indorsed by Mrs. Kennard, to the office of Opdyke, where they found Dodge and his wife, the plaintiff, and Opdyke. They say that the deed was then executed and delivered to Day, and he executed the $2,000 bond and mortgage, and delivered that, with a certificate of deposit, indorsed by Mrs. Kennard, to Dodge. That Dodge went then with Day to the bank, and got the money on the certificate. Dodge said, upon his examination, that the $4,000 was paid to him in cash, and that he did not go to the bank with Day; but upon cross-examination he stated that he took the certificate of deposit, or the draft, as he called it, to the bank, and got the money on it, after he had delivered the deed to Day, and that he procured two certificates of deposit for a portion of the money, which were produced upon the trial, and admitted by him to have been given to him. It is quite clear, therefore, that as to this portion of the transaction the evidence of Blake and Day must be accepted as against the evidence of Dodge. But there is no claim that at the time the deed was given anything was said about the $4,000 mortgage, although it is quite clear that at that time Dodge knew where the money had come from which Day had paid him in the certificate of deposit. It is not claimed on the part of the defendants that Dodge and Day, or Blake for him, had any talk together, after the first deal had fallen through, with regard to this transaction. Neither does Dodge make any such claim. But it is very clear that the attempt to bargain was at one time abandoned, and that it was subsequently renewed through the intervention of somebody apparently representing Dodge, who gave Blake to understand that the contract could be made, and induced him to send for Day. Blake says that whatever information he received upon the said subject he got from Opdyke, and he said that before he sent for Day he was told by Opdyke that the original proposition made by Day would be accepted, and that it was because of that information that he procured Day to come back from Lockport to buy the farm. Day says that after he had come back he was at Dodge's house, who asked him whether he had procured the money to buy the farm, and he said he could get it by giving a first mortgage upon the farm, to which he says Dodge made no reply. It is evident from all the testimony that Opdyke made the communication which induced Day to come back from Lockport to buy this farm, and that communication was, in substance, that the proposition of Day to pay $6,000 for the farm, borrowing $4,000 upon a mortgage to some third person, which should be a prior lien, and giving Dodge a $2,000 mortgage for the balance, which should be a second incumbrance, was accepted.

The only question is whether Opdyke had authority to make this communication. That he had such authority is not established by direct testimony, and undoubtedly upon the defendants was the burden of showing the fact. While their testimony on that subject must necessarily have been quite meager, yet I think there was enough of it to put upon the plaintiff the burden of explaining the situation and showing with whom the contract was made if it was not made with Opdyke, and showing what authority Opdyke had if it was denied by the plaintiff that he had authority to complete the bargain. The evidence is clear that Opdyke was the person who reopened the negotiations with Day. Dodge says, upon his direct examination, that Opdyke was not his agent, but that he made his own bargain. But it is clear from his cross-

examination that he did communicate with Opdyke, and that he did tell Opdyke that Day could have the farm on payment of $6,000. Indeed, he says that in his cross-examination, and it is almost necessarily to be inferred that he authorized Opdyke to commence negotiations on the subject. Whatever negotiations Opdyke may have made in pursuance of this authority, and upon which Day acted, I think Dodge was bound by it. It appears that Opdyke did, in making this communication, tell Day that the original proposition of Day would be accepted. So it appears, by necessary inference from the testimony, that Dodge authorized Opdyke to negotiate with Day with regard to the price of the farm; that he gave him some instructions about it; and that Opdyke must have known what the original proposition was, because he advised Blake to say to Day that the original proposition would be accepted. Blake states fully that the original proposition was to pay $6,000, giving a mortgage for $2,000 and paying $4,000 in cash, to be raised by a first mortgage upon the premises; and that he understood that that was the proposition accepted is necessarily to be inferred from the fact that he took steps to have that precise proposition carried out, and borrowed $4,000 with the representation that it had been agreed that the mortgage to be given for it was a first mortgage. Blake was a perfectly disinterested man in the transaction, and there is no reason to believe that he would have made such a representation had he not supposed that it was the agreement between the parties. It is certainly fairly to be inferred from the defendant's testimony that Dodge gave to Opdyke some instructions with regard to this transaction, which Opdyke acted upon in renewing the negotiations, and giving Blake the assurance which Blake says he gave him; and that he thought when he did it that he was acting by the authority of Dodge. If Day dealt with Opdyke, acting upon the authority of Dodge, it is fairly to be assumed that Opdyke went no further than his authority authorized him to go; and if it is the claim of the plaintiff that he exceeded his authority, and made a bargain which he had no right to make, certainly it was for the plaintiff to show in what respect he exceeded his authority and what his authority was. Two persons only knew precisely what the facts were in that regard. One of them was Dodge, who, either because of the failure of his recollection, or for some other reason, gave very unsatisfactory testimony on that point. The other was Opdyke, who sat in the court room assisting the counsel of the plaintiff in the trial of the action, and giving him advice and information, but who was not put upon the stand by the plaintiff. As he was not put upon the stand by the plaintiff, it is fair to assume that his testimony would not have tended to show that he had any less authority from Dodge than the defendant's testimony warranted the court in inferring that he had. There is no doubt that, in the absence of any proof upon the subject, the law would imply that the $2,000 mortgage was a prior lien to any other one given at the same time to a person who was not the owner; but such a presumption, of course, will not apply to a case where there is an express agreement as to the priority of the respective mortgages. That there was such an agreement in this case is, as I have said, fairly to be inferred from the testimony. The mortgage then in Dodge's hands was a subsequent lien to the $4,000 mortgage given to Mrs. Kennard.

It is not necessary to examine into the nature of the consideration paid by Mrs. Dodge to her husband for this mortgage, because it is well-settled law that Mrs. Dodge, being the assignee, took her mortgage, not only subject to all the equities existing between the parties to that mortgage, but to the equities which third persons could enforce against Dodge. Greene v. Warnick, 64 N. Y. 220; Hill v. Hoole, 116 N. Y. 299, 22 N. E. 547; Owen v. Evans, 134 N. Y. 514, 31 N. E. 999. Mrs. Dodge could get no better title to this mortgage than her assignor had, nor does the mortgage have any higher standing as a lien in her hands than it did in the hands of her husband.

The conclusion is, necessarily, that the defendant's mortgage is a lien prior to that of the plaintiff, and the sale which the plaintiff is entitled to have under her mortgage must be made subject to the lien of the mortgage held by Mrs. Kennard's executors. As the plaintiff and these executors seem to have been litigating this matter in perfect good faith, there is no reason why Mrs. Dodge should be charged with the costs of the litigation of this question, and each party may, however, have costs out of the proceeds of the sale.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, GREEN, and WARD, JJ.

Edwin Hicks, for appellant.

Charles A. Hawley, for respondent.

PER CURIAM. Judgment affirmed, with costs, on the opinion of RUMSEY, J., delivered at special term.

(19 App. Div. 41.)

LANDON v. CITY OF SYRACUSE et al.

(Supreme Court, Appellate Division, Fourth Department. June 12, 1897.)

1. MUNICIPAL CORPORATIONS—SPECIAL ASSESSMENTS—VALIDITY.

An assessment by city on particular property owners, made to cover the expense of water connections between their properties and the street main, put in by order of the common council, without authority or request of the owners, is illegal; there being no provision for such taxation in the city charter.

2. SAME—PRESUMPTION—BURDEN OF PROOF.

By Laws 1885, c. 26, §§ 123, 125, when property is sold for taxes, the warrants delivered to the treasurer and the conveyance executed by him are each considered presumptive evidence of the validity of all previous proceedings, including the assessment of the tax. Hence the burden of proving the invalidity of such assessment is upon the former owner.

Appeal from special term, Onondaga county.

Action by William N. Landon against the City of Syracuse and another. From judgment for plaintiff, defendants appeal. Affirmed.

The following is the opinion of Mr. Justice HISCOCK at special term in this and two other similar actions tried together:

Each of these actions was brought to have vacated and annulled as void and without jurisdiction a purported local assessment for the purpose of defraying the expense of laying a connection between the main water pipe in Salina street and the curb of plaintiff's property, and to have restrained and enjoined all proceedings instituted or threatened for the purpose of enforcing such assessment. A twofold defense is urged—First, that such assessment is valid; and, second, that, even if it is invalid, there is no occasion for this resort to a court of equity. There was substantially no dispute upon the trial of these actions about the facts, and in each thereof the following, amongst other facts, were either undisputed upon the pleadings, or conceded upon the trial: Some time on or about October 24, 1892, the common council of the city of Syracuse entered into a contract for the paving of South Salina street in front of the premises of each of the above-named plaintiffs. Prior to the paving of said street, and on or about October 24, 1892, a resolution was adopted by the common council requesting the water commissioners to put the necessary water mains in said street where such pavement was to be laid; and thereafter, and prior to June 5, 1893, the property owners at the location involved were notified by the commissioner of public works to make necessary water connections with said water mains, and that, in case of their failure so to do, the same would be made by the city at their expense. Thereafter, and on or about June 15, 1893, by the common council of said city, the clerk was directed to advertise for making such of said connections with the water main as had not been made by the property owners, and some time subsequent thereto the common council, by resolution, authorized and directed a contract to be made by the mayor and clerk for making said water connections. Thereafter, the assessors, by said common council, were directed to assess the cost of making such connections upon the property owners involved, including plaintiffs, which they thereafter did, resulting in the assessment complained of;